On behalf of the athlete, Ms. Phyllis Perco, Mr. Bancic, is that how you pronounce it? Good morning. May it please the court, my name is Adler Bancic and I'm here on behalf of the plaintiff, Ms. Paula Bonhomme. Your Honor, this case is not neutral and I'm confident that a thorough reading of the case following the underlying fact pattern would impart a measure of consternation. On a legally fundamental level, we are here because the lower court erroneously dismissed plaintiff's cause of action under Section 2615 of the Illinois Code of Civil Procedure. On a more general level, however, we are here because the plaintiff was victimized by defendant's predatory, repeated misrepresentations that occurred over the course of a two-year period. Well, does being a victim necessarily mean that there is a cause of action? Your Honor, under the circumstances in this case, we would submit that based on the defendant's predatory nature, the fact that the defendant was advertising through her website, the fact that she was purposefully, out of pure sadistic pleasure, or for pure sadistic pleasure, taking advantage of people that she would encounter online as some sort of game, that would raise this issue to something that is actionable. The definition in this case would be actionable. The misrepresentation would be actionable. How many complaints did you file? There were three amended complaints and an initial complaint. The first complaint that was filed was pursuant to a degree order after the plaintiff provided a host of discovery documents, basically a box full of e-mails and correspondence that occurred over this two-year period. We agreed with opposing counsel to file a first amended complaint so we can capture all of this additional information. Did the final amended complaint include or incorporate, by reference, all the other counts that had been dismissed with prejudice by the trial court? The final amended complaint, which was the third amended complaint, that was ultimately dismissed merely had a fraudulent misrepresentation count. Is that all you're going on then? No, the notice of appeal, we are appealing the dismissal of counts one through four of the second amended complaint and the dismissal of count one of the plaintiff's third amended complaint. Did you ever bring those up in the third amended complaint? Did you join those other counts that were previously dismissed in the third amended complaint? I believe those issues were reserved for appeal in our notice of appeal. How so? In our notice of appeal, I don't have that in front of me at the moment. But we had alluded to the fact that we were seeking to appeal those dismissals of counts one through four of the second amended complaint in addition to count one of the plaintiff's third amended complaint. So that's the only basis on which you believe you have not abandoned the prior counts? That is correct, Your Honor. Thank you. Moving on, this case has been procedurally frustrating, largely as a result of defendants' very successful confusing of legal terms of art. This case has a very detailed fact pattern behind it. The lower court found the first amended complaint that had most of the discovery material that the plaintiff provided after we filed our initial complaint, the lower court found that to be too much. After we revised it into the second amended complaint, the court found that to be too concise, too little, and dismissed those causes of action, leaving us to file a third amended complaint, saving the fraudulent misrepresentation count. So does counts one through four of plaintiff's second amended complaint and count one of plaintiff's third amended complaint meet the code's pleading requirements? And thus, the dismissal by the trial court under section 2615 was erroneous and should be reversed. Defendant's strategy throughout this case, as punctuated in its defensive brief, has been to feign confusion and to throw its arms up in the face of isolated paragraphs that it submits are singularly unable to support plaintiff's enumerated causes of action. However, as plaintiff's brief shows and as the Illinois Code of Civil Procedure requires, literally construing plaintiff's pleading show that among the many, many paragraphs and exhibits in plaintiff's complaints, a set of facts exists on which plaintiff can recover. Initially, plaintiff's count for intentional infliction of emotional distress was erroneously dismissed under section 2615, as the trial court, without setting any case law, merely held that because specific dates were virtually nonexistent. To quote, the complaint was insufficiently specific. However, Illinois pleading requirements only mandate this type of specificity where the issue is one of statute of limitations. And this is not the case. Illinois courts have found that intentional infliction of emotional distress claims were sufficient where plaintiffs are alleging merely a few dates or where a duration of behavior is qualified. So not only does the Illinois Code of Civil Procedure not require specific dates for each and every allegation, but plaintiff's second amendment complaint speaks to dates and times in 20 paragraphs referencing 10 exhibits and identifies the overall two-year period in which defendant behaved so objectionably. Does the restatement create a cause of action based upon computer internet fraudulent representation? Your Honor, the plaintiff's complaint for intentional infliction of emotional distress is the result of behavior that goes beyond just what occurred on the internet. Granted, the plaintiff and defendant met on the Deadwoods board in a chat room. However, soon after that, the relationship evolved into something that I guess anyone would consider to be substantial. I mean, they were talking about meeting on the internet, and over the course of two years, the defendant is coming up with this movie set of characters, 20 different individuals, including a little kid, Reese, who was the alleged niece or daughter of this Jesse James character. At no point were any of these fictitious characters believed by the plaintiff to be fictitious. Indeed, the scope of this misrepresentation was such that no person would think that they were being duped, and the plaintiff had no idea that behind all of this, behind two years of communication and a box full of e-mail correspondence, letters, phone calls, that it's just one woman who is doing this because she finds it amusing. Are you saying that women aren't capable of doing the things that a man can? I'm not saying that at all, Your Honor. I'm sorry. Let's talk about McGrath v. Fahey. Tony cites that case in their brief and talks about conduct being so outrageous in character and so extreme in degree as to go beyond all bounds of decency. That's what you're submitting happened in this case, that the defendant's conduct was so outrageous? Is that what you're submitting? That's what we're submitting. Did you plead that? Did you plead specifically in your complaint? I mean, you talk about susceptibility of the plaintiff or the victim, if you will, but you didn't really plead that in your complaint, did you? In our second admitted complaint, we are complaining that defendant's conduct was extreme and outrageous based on the temporal duration of the misrepresentations, the extent to which the defendant had created this cast of characters, and then once that was all over with, after the two years had gone on, the plaintiff had traveled across the country and engaged in all of this back and forth. Then once it comes out in the open that defendant has been putting the plaintiff on this whole time, defendant goes on her website and then defames her just to spite this and then to sort of bring the situation full circle as if, well, my ruse, I had fun while I lasted. I duped Ms. Fahey for two years. I had all this to show for it, and I guess that's it. That, in any society, would not be acceptable. The defendant's position, though, by and large, is that this was all fiction, and it should have been obvious it was all fiction, and therefore the client may not be the nicest person, but it was a big story. There is a difference in the conflation between defendant's submission that this is a fiction and what is fictional. There is a difference. At no point was any of this, I mean, the defendant rests that argument on the fact that the principal individual was named Jesse James. If you look up a phone book, there are probably 25 people named Jesse James. The plaintiff in this case is from California. She knows people named Zappa and Mooncloud. The fact that the guy's name is Jesse James isn't dispositive of some sort of ruse that it would be so obvious. If it was just one individual named something that was off this wall, maybe, but Jesse James isn't that unnatural of a name, and including 20 other people who are all corresponding with the plaintiff simultaneously in different handwriting. And what kind of damages arose out of the misrepresentations? Out of the misrepresentations, essentially how that was injurious, all through the course of the two-year period in which the defendant was putting the plaintiff on. The defendant held herself out as a licensed therapist, so the plaintiff confided in the defendant pretty much everything that was on her mind, whatever marital troubles she had. And despite this, the defendant took this information and threw it back at her. Had the defendant not misrepresented herself as something she wasn't, that security, I guess that position of confidence would never have existed. And perhaps if that never happened in the first place, the plaintiff might not have ever proceeded in two years. I think what I'm asking you is the ballpark figure in dollars or euros, one of the two. The complaint specifically alleges damage amount for seeing a therapist in about $5,000, which at the time of filing it was $5,000 the plaintiff had paid to see a therapist based on everything that had gone on. Additionally, the plaintiff had traveled, had sent gifts. Are you claiming that the gifts should not have been given and you're asking for the refund? Had the defendant not misrepresented herself, the plaintiff would not have made the purchases and expenditures that she did. So yes, I would say that. And that would increase it more than $5,000 or would it remain the same? It would naturally increase. All told, I would have to go through the second minute complaint and add up exactly the dollar total of what plaintiff is out as a result of defendant's misrepresentations over this two year period. But the $5,000 was specifically enumerated in the defamation for fraud counts. Before we even get to money, count two is negligent infliction of emotional distress. Talk to me about where in the complaint you established a duty of care. What was the duty of care owed to the defendant, owed to the plaintiff by the defendant? The duty of care is owed twofold. First of all, the plaintiff alleges that the duty arose through the contractual aspect of logging onto the website, the Deadwood boards. There are terms of use and policies that govern how people interact. It's not for the website's benefit because under the Communications Decency Act, there's no threat of lawsuit if you're a website operator. You wouldn't have to worry about being sued because someone has been used illegally. Those terms of use, those policies exist to protect people from each other. But in your complaint, did you lay out what was on the Deadwood website with respect to that contractual obligation? The terms of use of the Deadwoods is in the second amendment complaint. One of those terms is that people who sign up and communicate to one another on the website can't misrepresent themselves, they can't engage in what would otherwise be tortious activity if they were doing it in person and not just on the website. But is that set out for the Deadwood people or is that set out there for everybody and anybody who signs on that site? Everybody who registers on the site to be able to communicate with one another is signing up to be bound by those terms. I guess my question is who are they trying to protect? They're trying to protect individuals from one another. So you register on a website, you can't post anything on the website until you register. That is the one measure of control the website operators have when people communicate. Okay, so you said it's twofold the duty of care. One is the contractual obligation on the website. What's the other? The second would be the personal and special relationship that plaintiff alleges existed. Again, the defendant called herself out as this licensed therapist, which we allege she ultimately wasn't. And based on holding herself out, she created that special relationship. But doesn't the McCartney case talk about a special relationship and states that a fiduciary duty doesn't arise merely because of friendship or kinship or a relationship? How do we get from a personal relationship to a duty of care? The personal relationship, McCartney says that just because there is a fiduciary relationship doesn't mean you have a legal duty to do anything for somebody. However, the test for whether a duty exists can be based on the extent of the relationship. We're not talking about a relationship that was just a meet-and-greet. This occurred over a period of two years. Your client is not alleging that they had a therapeutic relationship. She's looking to more of a romantic or a friendship relationship, correct? The defendant held herself out as a licensed therapist, and based on that representation, that relationship wasn't merely professional and it wasn't merely platonic. We would submit it was some mixture of both. And over the course of two years, the duty evolved from that dual relationship. She wasn't just a friend or a false friend, it turned out to be. And it wasn't just a false therapist. So through those two avenues, plaintiff is alleging that the duty existed, and that's what's propping up the negligent infliction of emotional distress claim. Thank you. You'll have an opportunity for a photo. Thank you. Ms. Burko? Good afternoon, Your Honors. The ultimate question in this case, of course, is whether or not the various counts are sufficient to state a cause of action. And there really are dual problems in this case. Before we get to the multiple counts, do you believe that the other counts have been preserved for purposes of this appeal? I truly wish I would have made that argument or explored it when I prepared my brief, but obviously I did not. I understand it wasn't in there. I will say the following, Your Honor, actually in favor of the appellant. I mean, they did move for a 304 finding in order to take an immediate appeal. So, I mean, I think that that, from the dismissal of the first four counts, the counts that are not included in the third amended complaint. So, I mean, ignorant of what other aspect of the law might support a theory, I don't think there's a very good argument for abandonment. Since, I mean, not only do we have the notice of appeal, but we also have them seeking a 304A finding. I don't know that I would be comfortable with that argument. But I'll frankly admit to the court that I cannot, off the top of my head, state whether or not that third amended complaint should nevertheless have incorporated the other counts. I think it would have been the better practice, but I'm not. You're saying that the appellant made a request for a 304A finding? He did. Was it granted? No, it was denied. And then that third amended complaint. Upon which amended complaint was it made? It was made on the second amended complaint. So when the four counts, severe emotional distress and negligent infliction of emotional distress, and the two defamation counts. When those were dismissed, then it was a request for a 304A finding. So there are dual problems then in this case. One of the problems in some of the counts is that even the well-pleaded facts would not support a cause of action. In others, in other of the counts, there simply are not facts pleaded at all. There are really only conclusions pleaded. And I think, or I will submit to the court, that that is indicated at least to some extent by appellant's argument today, where appellant begins the argument essentially discussing my client's alleged predatory nature and what my client is alleged to have done in other circumstances or what the homepage of her website allegedly indicates. And the fact of the matter is, legally speaking, a cause of action cannot be predicated on a person's nature or a person's previous conduct. I mean, that simply is not the way a complaint nor even the ultimate legal issues in a case at trial are tested. That is not a legitimate approach to the question. There's a characterization by appellant that we have, in our briefs, stereotyped what we claim to be inadequate portions of the complaint. But I submit to the court that it is really far more than that. I mean, these complaints are simply fundamentally insufficient. And one really has to look at each and every single one of the counts that are here under consideration to understand the failings. With reference to the intentional infliction of extreme emotional distress, Justice Shostak points out that the question really here, a basic question, is whether or not there is extreme and outrageous conduct. The cases have called this, the initial case in this field, Knierim v. Izzo, talked about whether or not there was an aggressive invasion of plaintiff's mental equanimity. Well, when we talk about the context, because it is context that is all important for determining whether or not there is extreme or outrageous conduct, we cannot ignore the fact that this relationship occurred in large part in cyberspace on the Internet. There is not a single case cited in the appellant's brief that would indicate that the conduct here is the type of extreme and outrageous conduct which the case law envisions to constitute the cause of action. Don't you take your victim as you find them, though? I mean, in this case, you have somebody who maybe some conduct that might not be so extreme or outrageous to her was extreme or outrageous because of her fragility, if you will. It is a fact, Your Honor, and there are about four or five different hallmarks of what constitutes extreme and outrageous conduct. And certainly, the plaintiff's peculiar susceptibility can be such a factor, but in fact there is no allegation of peculiar susceptibility of this plaintiff. We have a lot of talk about ensuing damages. But wasn't she treating her as a therapist or allegedly? No, that is absolutely false. I double-checked the allegation, which if memory serves, is paragraph number 76. First of all, there's not an allegation that she held herself out, that my client held herself out as a, quote, licensed therapist. And furthermore, there's no allegation that she entered into a therapeutic relationship with the plaintiff. I mean, for me to say that I am a lawyer to any man that I meet on the street or any entity that I encounter in cyberspace is true, but that statement is a far cry from my rendering a legal opinion that puts me on the line for whatever. So, I mean, there are not allegations in this complaint that establish that she held herself out and entered into a therapeutic relationship. And I cite a case in my answer brief that indicates that that's the kind of relationship that gives a rise to a cause of action. Do you see anything untoward or improper about presenting oneself as a member of the opposite sex who has fallen in love with an individual, and when that individual indicates that she wishes to meet this love of her life, that your client, the individual, then indicates that the person precipitously died from some sort of serious disease? You don't see anything basically untoward or, how should I put it, unjust, unreasonable? Well, I've thought of the terms unusual, distasteful, and undesirable. Abnormal, subnormal? No, unusual, distasteful, and undesirable. I mean, there were three that I picked as a way to characterize the conduct that's been alleged. But to say that conduct is undesirable is not to say that it is actionable. And with reference to outrageous conduct, and there's a particular paragraph or discourse in my answer brief that talks about this, of the conduct, we have another factor or another hallmark. And these other factors and these other hallmarks have been the defendant's superiority or power over the plaintiff or the plaintiff's peculiar susceptibility. We don't have that in this case. Well, let's go back to the peculiar susceptibility. Wasn't she, wasn't the plaintiff depressed because of actions in her own life that had occurred, or wasn't there a death of a parent or something that had recently gone on? There was a suicide of a parent that is alleged to have caused the plaintiff to suffer a lot of grief. But there's no indication from the complaint, there's no allegation from the complaint, that my client necessarily knew about that. I heard a representation today from counsel as he presented his argument, but there is no allegation to that effect in this complaint, that my client was aware before this fiction, this fantasy, this charade started, that the plaintiff had any conditions or any peculiar conditions. So, no, I mean, that was not in there. All right. Well, couldn't an inference be drawn that, lo and behold, during the course of the relationship, the cyber relationship, Jessie might try to commit suicide? Is there some inference that she's, you know, that she did know, and that this is just an attempt to hurt this woman? Well, I don't think that there is an inference that she did know. I mean, I read the complaint over and over with reference to the damages portion to see whether or not there were, for instance, she describes that the plaintiff describes in the complaint that she communicated to the defendant, that she, the plaintiff, was depressed and stressed, I believe are the two words. It doesn't say that she communicated why she was depressed and stressed, and so we have this complaint that is very, very lengthy and attempts to paint a picture based on numerous irrelevancies, including the ones that I've pointed out with reference to these claims of my client's predatory nature based on something that has nothing necessarily to do with this case. So we have these very broad claims, but we don't have the kinds of specific allegations that would support these claims. I'm going back to the outrageous conduct hallmarks, the superiority, the peculiarity, threats, violent conduct, criminal conduct. None of that kind of conduct is involved in this case. We also complain prominently in our answer about the fact that there's an inadequate pleading of the intent element on the emotional, the intentional infliction of severe emotional distress. On the negligent infliction of emotional distress, our primary argument truly is the absence of a duty of care under these circumstances. The Deadwood board's policy, I mean, not all of the conduct is alleged to have occurred on the Deadwood boards. It's very difficult to tell what kind of may have occurred on the Deadwood boards. It's not specifically alleged in this complaint. So the application of any policy or standard of care, I mean, we don't know what happened on the Deadwood boards. And furthermore, that just doesn't extend to the remaining conduct which occurred off the boards and even in personal interactions, meaning live interactions, not cyberspace interactions. So there simply is not a duty of care established from the Deadwood boards. Is that the only way they communicated was on the Deadwood boards? No, it's not. I mean, they communicated apparently by mail. They exchanged gifts. There's reference to telephone calls in which my client is alleged to have disguised her voice. There eventually was a meeting in person. So, I mean, there's a good deal of conduct we know that did not occur on the boards. We don't actually know what conduct, what interactions, what communications did occur on the boards. That's something that we're actually ignorant about from this complaint, among other things. The relationship of friendship, I mean, that does not create a duty of care. There's an allegation in the complaint that there's a duty to be honest and prevent emotional harm. Well, I mean, that would create a duty of care by any user of the Internet or anybody who came in contact with anybody else to the entire world. These, and I've already addressed the therapist issue. I mean, there are simply no facts alleged in this case that would establish a duty of care. Let's talk about count one, Ms. Proko, the fraudulent misrepresentation, because we've been talking a lot about this. Count one, are you submitting to us that there was, that that count was not properly planned? We're talking about the count in the third amendment? Yes. Fraudulent misrepresentation. Yes, correct. Fraudulent misrepresentation. Right. I mean, the question that this court is squarely faced with, with reference to that count, is whether or not what is fundamentally a cause of action for a commercial context or a business context should be extended to this type of personal relationship. I mean, the case, the Dover v. Stilling case, which is really quite recent within the last couple of years from the Illinois Supreme Court, discusses at length the historical roots of this tort and its grounding in a business or commercial context, and goes on to discuss the fact that the extension of the tort outside of that context is extremely limited. And the only Illinois cases that the Dilling court recognizes as an exception to this commercial context arose in the adoption cases it seems to cite with some acceptance, so to say, or favorably cites the extension of the tort in cases of sexually transmitted diseases. But, I mean, these are very, very different than a mere personal relationship. I mean, there's really nothing in the reply brief that undercuts appellant's, excuse me, appellee's position that there is simply no case law that is at all similar that would justify the extension of the tort into this personal relationships context. Thank you. Okay. Thank you, Your Honor. Mr. Groves, prevention. If I might start my rebuttal with reading a passage from one of the exhibits of the complaint. Mermaid, now is my bedtime, but my mama said I can write about your dog, Doug. I saw his picture. Dying is sad. My daddy just died. My daddy really died. Your dog really died, but there is no way to stop it. Many dogs eat home, so I think your dog would want you to give a new one a home. I will get a dog soon. My daddy was going to help me find one, but he died. He will see my dog and your new dog from the sky. Today I got an R like my daddy's gite. Mama said it is from you. Daddy wore his gite up to the sky. I'm the next of kin, so I will wear this. I liked his gite. Now I have one to wear. Thank you very much. I still cry every day, and you will. It's okay to do that. We miss your daddy and your dog. Love, Maurice Anderson James. This is the defendant posing as a six-year-old, saying this to the plaintiff. And the six-year-old is one of 20 individuals she is posing as. As the defendant cites Knierim, the fact that the defendant in the lower court felt that this behavior, impersonating 20 fictitious adults and children, fabricating two years' worth of communication from all of them in this manner, and then taking the route so far as to meet in person for this advertised sadistic pleasure, how that is not an aggressive invasion of mental equanimity is rather astonishing. As the defendant talked to, the defendant submitted that there wasn't an allegation that the defendant was holding herself out as a therapist. Well, paragraph 76 of the plaintiff's second amendment complaint not only states that the defendant was holding herself out as a therapist herself, but she was impersonating Anne Martell, who actually was a licensed therapist. The defendant was aware of the plaintiff's particular susceptibility, as alleged in paragraph 53. Yes, I can read. At all times, the defendant knew or should have known that her actions were causing the plaintiff to seek medical attention because the plaintiff repeatedly related depression and stress directly to her. So the crux of the defendant's argument remains that because this started on the Internet, that everything that happened since they met that first time in the Deadwood Boards five years ago or four years ago, because it arose from that context then, all of this loathsome behavior I guess is just not actionable because the plaintiff should have been more sophisticated and should have somehow knew that being besieged by 20 people who are all interrelated, receiving all this stuff in the mail, as if that was some red flag. But don't you basically assume the risk when you get on the Internet and you just start talking to people across the country? I mean, how do you know that they are truly representing themselves as to who they really are? I mean, are we going to the courts? Are we going to monitor everybody's behavior on the Internet and say, oh, if you're going to say you're John Doe, you better be John Doe? Or are you opening Pandora's box, asking us to rule on this type of case? What the plaintiff is not asking the court to do is to hold a person accountable for not being forthright with his or her singular identity. But what has happened in this case is vastly beyond that. It's not as though the defendant, the same James, pretended to be one other person, and the plaintiff just never figured it out after two years with this one person. The defendant was 20 different people. Whether or not I or anyone would be able to know that I was being put on, I would not professionally or as an individual expect that 20 different individuals using different handwriting, different communication media would take it upon them to be one defendant. That is above and beyond. That is extremely outrageous. I understand that. But my question is, to what extent do we hold someone liable, or how do we impose a duty on someone who gets on the Internet and misrepresents themselves and falls upon someone who is, pardon me for saying it, as naive as your client? How do we extend a duty of care to individuals who are naive enough to get on the Internet and just start conversing with anybody all over the country and expect that that person is truly representing themselves? The communication, again, was of a sufficient magnitude that the duty should be imposed. Not only by a simple order. So you're looking at, if you will, the totality of the circumstances. There were so many different communications that then we should impose a duty. But if it was one person misrepresenting themselves as one person, then the duty doesn't extend. If I had a legislative pen with me, if it was one person communicating with another one person over the course of this amount of time and the other person was just focused on what that identity was, that may not be actionable. And what occurs between them, whatever misrepresentations may not rise to a level. But this is vastly beyond that. The exhibits contained in the second medical complaint illustrate this. And there's a file holder, a box with more stuff that we actually took out of the first medical complaint because the lower court thought that that was too much to wade through. And we understood that going in, going in, we realized that this is two years worth of communication in several different media formats. But I guess ultimately, the lower court's attitude in dismissing counts one through four of the plaintiff's second medical complaint and count one of the plaintiff's third medical complaint is blunted in that because to its knowledge, this has not occurred in the history of the universe. Therefore, the plaintiff could not possibly have alleged the facts necessary to prevail under the causes of action that enumerated. However, plaintiff's ability to do so is predicated on the Illinois Court of Civil Procedure requires and not on the courts, the lower courts, or anyone else's relative unfamiliarity with how social media works and how online social relationships develop. Is this analogous to the situation where an intrusion on seclusion has been determined in situations where someone makes continuing harassing phone calls, where the prior to Alexander Graham Bell's invention, there was no such cause of action. However, once it was invented and utilized, some courts somewhere along the way decided that there was, in fact, this tort created under the common law of Illinois or California or whatever, that you could actually use a phone to harass someone. Is it analogous to say that someone can use a computer to harass someone or to defraud someone? Very much so, Your Honor. And is the dearth of legal knowledge or exposition on the issue very slim, primarily because computers haven't been around for very long? Well, this type of behavior hasn't been enabled by our existing international computer network for very long. Facebook has 500 million users. That's just a phenomenon that has occurred in the last 10 years or so. I would imagine in the next 10 or 15 years there probably will be some state legislation somewhere that specifically enumerates you can't do this. I mean, people are suffering all the time. I believe California enacted such legislation in the last session or last year. At least that's what the Internet said they did. Now, that could be fraudulent, and it was misrepresented that they have created this cause of action, but I did see that in one of the little tidbits in the news. I guess fundamentally the law is supposed to evolve as society evolves so that when people are suffering, as the plaintiff, completely dead, the law will provide them recourse to recover for that, and that is really just what the plaintiff is seeking in this case. The plaintiff, under the Code of Civil Procedure, as plainly and concisely as possible, alleged facts sufficient to bring the counts at issue out from under any dismissal of Section 2615, and despite the fact that the complaint is admittedly likely and it has many complaints, at a minimum a set of facts exists that, if proved, the plaintiff might be able to prevail under them. So the dismissal of those causes of action under Section 2615 was erroneous and should be reversed. Are you saying that you've actually alleged those facts? Are you saying that the trial court abused its discretion in determining that no set of facts could be alleged? There's a difference. What we are submitting is that the trial court abused its discretion in finding that no set of facts, as alleged in the plaintiff's second and third amendment complaints, could be proven such that they could prevail under any cause of action. Is time up? I thought I heard you. Yes. Any other questions? No. Thank you. We'll take the case in revision and take a short recess.